1999 ND 122

**In the Matter of the Application for DISCIPLINARY ACTION AGAINST the Honorable Randall L. HOFFMAN, Judge of the District Court.**

**Judicial Conduct Commission, Petitioner,**

v.

**Randall L. Hoffman, Respondent.**

**Nos. 990060–990063.**

Supreme Court of North Dakota.

July 7, 1999.

Paul W. Jacobson, Assistant Disciplinary Counsel, Bismarck, for petitioner.

Randall L. Hoffman, Jamestown, respondent.

PER CURIAM.

[¶ 1] This is a disciplinary proceeding against Randall L. Hoffman, former district court judge. We conclude Hoffman violated the North Dakota Code of Judicial Conduct. We impose a disciplinary suspension and a condition for reinstatement.

[¶ 2] Randall and Wanda Hoffman married in 1975. They had two children. Randall was elected a district judge in 1994. When Randall and Wanda Hoffman were divorced in 1996, the Honorable Kirk Smith presided over the proceedings. The divorce judgment entered on November 22, 1996, decreed a divorce, awarded Wanda Hoffman the family home, divided the parties' other marital assets and debts, awarded them joint legal custody of the minor children, with physical custody to Wanda Hoffman and visitation rights to him, and ordered him to pay child support.

[¶ 3] Conduct by Randall Hoffman ("Hoffman") after his divorce ultimately led to disciplinary proceedings against him. This Court rejected an affidavit of consent and agreement and remanded the matter "for consideration of all charges and consideration of the apparent pattern of conduct reflected by all charges" on September 23, 1998. Four members of the Judicial Conduct Commission were appointed to serve as a hearing panel. The hearing panel conducted a hearing on January 7, 1999. After a meeting on January 28, 1999, the hearing panel issued findings of fact, conclusions of law, and a recommendation. In its findings of fact, the hearing panel reported clear and convincing evidence established the following facts:

## II.

Judge Hoffman was divorced from Wanda Hoffman [hereinafter Wanda], with the Judgment and Decree entered on November 22, 1996, in Stutsman County Case No. 96–C–238. The judge in the divorce case was the Honorable Kirk Smith. Thereafter, Judge Hoffman embarked upon a course of conduct marked by harassment, stalking, and abusive conduct towards Wanda and disrespect for courts.

## III.

The course of conduct referenced in paragraph II, above, consisted of the following:

(a) Letters and messages to Wanda with name-calling, and threats of actions against her for civil or criminal contempt and theft of property or conversion. . . .

(b) A public encounter with Wanda at the golf course in Jamestown wherein he used obscene gestures and words.

(c) Sitting in a vehicle outside Wanda's home for extended periods of time, sometimes after midnight.

. . . .

(e) Entering Wanda's home and the home of her friend Doug Wahl uninvited, including at least the following instances:

(1) On or about March 29, 1997, when Wanda encountered Judge Hoffman in the garage of her home. In the ensuing confrontation, Judge Hoffman caused physical injury to Wanda. . . .

(2) On or about June 4, 1997, in the early hours of the morning, Judge Hoffman entered the garage of Wanda's home.

(3) On or about August 31, 1997, Judge Hoffman entered the home of Doug Wahl, to which he had never been invited, in the early hours of the morning, and called to Wahl and Wanda in the darkened room, "I see you fucking people in there." The ensuing confrontation led to a Dual Protection Order against both Judge Hoffman and Wanda.

## IV.

The hearing, which resulted in the Dual Protection Order, was heard by the Honorable Donald L. Jorgensen on September 30, 1997. At hearing, Judge Hoffman demonstrated his disrespect for the Judgment and Decree, of Judge Smith, entered on November 22, 1996, which he characterizes as Judge Smith's "fiasco" and "Judge Smith's bullshit." Additionally, at the hearing on September 30, 1997, Judge Hoffman demonstrated his disrespect for the Court in which he was appearing, and challenged the Court's authority by his outbursts and objections though represented by counsel.

## V.

Jill M. Quarstad, formerly Christianson, appeared before Judge Hoffman on or about May 5, 1998, as a witness in a Class B misdemeanor harassment case wherein the defendant had been charged with making some 110 telephone calls to her. Though not relevant to the case, Judge Hoffman suggested a theory of self-defense and informed Christianson that she had an affirmative duty to facilitate a psychological relationship between the noncustodial parent and the child, and that Christianson is guilty of criminal contempt if she does not do that. Judge Hoffman inserted his personal situation and arguments as a noncustodial parent into the proceedings, and demonstrated a lack of dignity and courtesy to those appearing before him.

. . . .

## VII.

On or about March 23, 1998, Peter J. Koble appeared before Judge Hoffman on a Class C felony charge, violation of a protection order, regarding contacts

with Lisa Koble. Judge Hoffman presented himself in the proceedings as reporting violation by Lisa Koble to law enforcement as well, as there was a dual protection order. Judge Hoffman's conduct was colored by his own situation and arguments regarding his dual protection order, and criminal charges against him wherein he, but not Wanda Hoffman, was charged.

## VIII.

Judge Hoffman has failed to recognize or admit any responsibility for most of his actions.

[¶ 4] The hearing panel concluded Hoffman violated the provisions of Canon 2A,[1] Canon 3B(4),[2] Canon 3B(5), Canon 3E(1), and Canon 4A[3] of the North Dakota Code of Judicial Conduct. The hearing panel concluded Hoffman's violations were willful. The hearing panel recommended "that Judge Randall L. Hoffman be suspended for a period of six months and that he is to attend and participate in an anger management program."

1. Canon 2, N.D.Code Jud. Conduct, provides in part:

*CANON 2*
*A Judge Shall Avoid Impropriety and the*
*Appearance of Impropriety in All of*
*the Judge's Activities*
A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

2. Canon 3, N.D.Code Jud. Conduct, provides in part:

*CANON 3*
*A Judge Shall Perform the Duties of*
*Judicial Office Impartially and*
*Diligently*
. . . .
B. *Adjudicative Responsibilities.*
. . . .
(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity. . . .
. . . .
(5) A judge shall perform judicial duties without bias or prejudice. A judge shall not,

[■] [¶ 5] "We are empowered under N.D.C.C. § 27–23–03(3), on the Commission's recommendation, to censure or remove a judge for a willful violation of the Rules of Judicial Conduct." *Disciplinary Action Against Grenz*, 534 N.W.2d 816, 817 (N.D.1995). "We review the Commission's findings and recommendations de novo on the record." *Id.* at 817–18. We accord due weight to the hearing body's findings, because it had the opportunity to observe the demeanor of the witnesses. *Id.* at 818. "Before a judge may be censured or removed, the charges must be established by clear and convincing evidence." *Id.* at 818. "The term 'willfully,' when used in disciplinary proceedings, means acts that were the performer's free will and were not done under coercion." *Judicial Qualifications Comm. v. Schirado*, 364 N.W.2d 50, 52 n. 3 (N.D.1985).

[¶ 6] At oral argument, Hoffman admitted he violated the Code of Judicial Conduct, but not to the extent or in the manner alleged. He said he used language for which a public censure would be an appropriate sanction. Hoffman also said he was angry, which is normal in a divorce, and he

in the performance of judicial duties, by words or conduct manifest bias or prejudice. . . .
. . . .
E. *Disqualification.*
(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. . . .

3. Canon 4, N.D.Code Jud. Conduct, provides in part:

*CANON 4*
*A Judge Shall so Conduct the Judge's*
*Extra–Judicial Activities as to*
*Minimize the Risk of Conflict With*
*Judicial Obligations*
A. *Extra–Judicial Activities in General.* A judge shall conduct all of the judge's extra-judicial activities so that they do not:
(1) cast reasonable doubt on the judge's capacity to act impartially as a judge;
(2) demean the judicial office; or
(3) interfere with the proper performance of judicial duties.

is only human. However, judges are held to a higher standard than others:

> [J]udges must be and are held to higher standards than laymen. Judges hold a unique position of administering justice. They symbolize the law and justice and, consequently, their action and behavior will reflect favorably or unfavorably on the integrity of the judiciary and the high respect required in the administration of justice.

*Matter of Cieminski,* 270 N.W.2d 321, 327 (N.D.1978).

[¶ 7] In his brief, Hoffman contends the heading of the hearing panel's findings, conclusions, and recommendation states he is a judge of the county court, when he is a judge of the district court. The offices of judge of the county court in each county were abolished on January 1, 1995, and district court judgeships equal to the lesser of the number of county judges serving on January 1, 1991, or January 1, 1994, were established on January 2, 1995. 1991 N.D. Sess. Laws ch. 326, § 1. The designation in the caption of the hearing panel's findings, conclusions, and recommendation is mistaken, but irrelevant to any issue in this case, and we will not further address it.

[¶ 8] Hoffman objects to the hearing panel's second finding of fact for several reasons, stating in part:

> The Counsel alleged and the Hearing Panel found that after the divorce I "embarked upon a course of conduct marked by harassment, stalking, and abusive conduct towards Wanda and disrespect for the courts." ... Harassment and stalking are crimes. See 12.1–17–07; 12.1–17–07.1 NDCC. If my actions consisted of a pattern of misconduct, specifically harassment, stalking, then I should be accused with committing acts consisting of the elements of these crimes....
>
> ....
>
> I object to the use of the term, "marked by" instead of using the term,

"consisting".... If my specific conduct is such that there is a pattern of improper activity, then I will accept the discipline.... I do not willingly accept the discipline of a course of conduct marked by harassment and stalking unless my specific conduct constitutes the elements of these crimes.

> ....
>
> I specifically object to the use of the term "stalking".
>
> ....
>
> I object to the use of this entire paragraph, as alleged and found, as the paragraph stands alone with no definitions or alleged specific misconduct.... The reality of my present situation is that the accusations are nonsense. When I was back on the farm in central North Dakota, for longer than I have been an attorney, cattle ranchers had another name [for] this kind of stuff.

[¶ 9] Whether or not any of Hoffman's conduct was criminal is irrelevant. "Disciplinary proceedings are neither civil nor criminal. Their aim is to maintain the honor and dignity of the judiciary and the proper administration of justice." *Matter of Cieminski,* 270 N.W.2d 321, 326 (N.D. 1978). The relevant question is whether or not Hoffman violated the Code of Judicial Conduct. Further, whether Hoffman's post-divorce "course of conduct" was "marked by" (as found by the hearing panel) or "consisting" of (as argued by Hoffman) "harassment, stalking, and abusive conduct," is a matter of no moment.

[¶ 10] Hoffman addressed the hearing panel's findings about his conduct at Wanda Hoffman's home, Doug Wahl's home, and the Jamestown golf course in his brief: (1) "I admit that I acted with free will and without extreme coercion in sending letters and messages to Wanda with name calling and threats of actions against her for civil or criminal contempt and theft of property or conversion" about the Grand Am car my daughter drove; (2) "The name calling went both ways and was similar in content"; (3) Hoffman admitted using ob-

scene gestures and words in an encounter with Wanda Hoffman at the golf course in Jamestown, but took "exception to the failure to find that the only persons present were Wanda, myself, Doug Wahl, and Dwight Kendall who is a cousin of Wahl's and friend of mine"; (4) In addressing the hearing panel's finding he sat "outside Wanda's home for extended periods of time, sometimes after midnight," Hoffman asserted "There is nothing in the record to show specific times and dates or number of occasions.[4] This is hardly clear and convincing evidence.... Wanda never said she was frightened, intimidated or experienced mental anguish"; (5) Hoffman asserted he owned the car driven by his daughter and "had a right to be there to retrieve my vehicle," on an occasion early on June 4, 1997, when a police officer was dispatched to Wanda Hoffman's home; (6) "The Hearing Panel found that on March 29 th, 1997, I encountered Wanda in her garage and I caused physical injury to Wanda.... There is nothing regarding intent. There is nothing whether I caused the injury intentionally, knowingly, recklessly, negligently, or willfully"; (7) "I will admit that I negligently contributed to causing physical injury to Wanda. I admit that my contributory negligence was less than 50 percent.... It is unreasonable to sanction a judge for negligent conduct"; (8) If the incident resulting in Wanda Hoffman's injury "could be judged as misconduct, then there is insufficient clear and convincing evidence that I caused her injury. This whole problem comes from the divorce decree"; and (9) With regard to the hearing panel's finding that on August 31, 1997, Hoffman entered the home of Doug Wahl without invitation, and "called to Wahl and Wanda in the darkened room, 'I see you fucking people in there,' " Hoffman said, "I admit to the language used. I do not admit that I violated the code by any other conduct. I did not enter the home.... Wahl has been saying from the

beginning that I opened the door. I did not."

[¶ 11] The record of this matter indicates Wanda Hoffman testified she found a note from Hoffman on the cupboard in her house at a time when Hoffman was not living there, had not been invited into the house, and had been told "not to come into the house unless he was invited." Wanda Hoffman testified that in August 1997, at the golf course in Jamestown, Hoffman had "come right up to me and put his middle finger up, and 'fuck you' is what he said to me," and Hoffman's hand "was not very far. Couple feet, maybe," away from her face. Wanda Hoffman testified Hoffman later "stopped and he watched us, and I remember as we were going from the men's tee box to the lady's tee box, I looked at him and he was sitting in his car with his middle finger up at us, and then he left." Doug Wahl and Dwight Kendall corroborated Wanda Hoffman's testimony about the incidents at the golf course.

[¶ 12] Wanda Hoffman testified, "Randall would kind of go in spurts where he would decide that he wanted the car back" that his daughter was driving. Wanda Hoffman testified about one instance when Hoffman came to get the car:

[H]e come over to the house once again to get the car. I met him in the garage, I stood between him and the car, and I said to him, Why do you keep doing this? What is it that we have to do to get this straightened out that you are going to leave us alone with this car? I'm making the payments, everything is up to date.

He grabbed me at that point by the shirt that I was wearing. He proceeded to push me into the wall of the garage, which is right next to the door that goes into the house. When I hit the wall, ... [my daughter] come to the door, she opened the door—the storm door....

4. In light of the purposes of judicial disciplinary proceedings, greater specificity is relatively unimportant.

Randall had let go of my shirt, and when I started to move sideways to go into the house, he gave me a big push. I hit the storm door that was open with my leg, with the top of my leg.... The injury that I received that—it was an injury to my left leg, upper leg, and he left at that time.

Disciplinary Counsel introduced a photograph of a resulting bruise to Wanda Hoffman's leg. Wanda Hoffman testified Hoffman "would come to the house, he would open the walk-through door of the garage, turn on the light, look to see if the car was there, and then he would go back to his car." Wanda Hoffman testified that, on another occasion, "Randall had been in my garage during the night and put a Club on the car [that our daughter drove] from the brake to the steering wheel ... as it was sitting in the garage." Wanda Hoffman also testified that, on other occasions, Hoffman "would drive by my house."

[¶ 13] Wanda Hoffman testified about an incident when Hoffman came to Doug Wahl's house on August 31, 1997, at about 12:30 a.m.:

A.  Yes, yes. We'd only been there for about ten minutes when the pounding started on the door.

Q.  Okay. What did you and Doug do after you heard pounding on the door of the house?

A.  I remember saying to Doug—you know, it was like we could hear this, the dog started barking, you know, we got up and we turned the TV off, we turned the fan off, and it was just a continuous pounding on the door. The dog was barking, pounding on the door, and I remember saying to Doug, [i]t's probably Randall. He's been at it here again tonight, phone calling....

. . . .

A.  We went downstairs to the kitchen, standing, looking out the window. It looks out to the street, and you could very well see at that point that it was Randall's car.... Pretty soon you could hear somebody saying something

to the effect of, I can see you fuckers in there, something in that order. So the doors were open for him to be able to see that we were even in there. He threw a letter in the door, told Doug to give it to me—I don't remember what his exact words were, "fucking bitch."

. . . .

A.  Yes. He threw the letter in the door and turned around to leave or, you know, started leaving after throwing this letter in and saying what he said. Doug and I followed him out....

I remember Doug using—we opened the garage door, which he had shut, and when we opened the garage door and stepped outside, Randall was walking away, but he turned around, and he looked at Doug and he said, "I've been waiting for this," and he come at Doug, and Doug was standing there and he put his arms up and stopped him from getting to him, and they started wrestling around.

Wanda Hoffman sought a restraining order against Hoffman after that incident.

[¶ 14] Doug Wahl also testified about the August 31, 1997, incident at his home:

A....  I heard his voice come from my door over—my walk-in door to the house ... was open and he swore or said he could see us.

Q.  Do you recall the words that he used?

A.  I believe he said "you fucking son of a bitches." I went to the door and opened the door all the way, and he threw a letter of some sort in my face and said to give that to fucking Wanda, and he turned to leave and I followed him out the door, and ... he turned and said, "I've been waiting for this," and threw a punch at me, which I blocked, and we started to scuffle.

Wahl testified he had never invited Hoffman to his home before or on that night.

[¶ 15] Hoffman's limited admissions concerning his conduct at Wanda Hoffman's

home, the Jamestown golf course, and Doug Wahl's home do not begin to address the serious nature of his misconduct. Hoffman does not seem to recognize that, regardless of his ownership of the car his daughter was driving, and whether he intended to injure Wanda Hoffman, he should not have been entering Wanda Hoffman's garage to check on the presence or absence of the car, entering Wanda Hoffman's house to leave messages, accosting Wanda Hoffman and making obscene gestures to her, parking outside her house, appearing uninvited at Doug Wahl's home to leave a letter for Wanda Hoffman, or engaging in a physical altercation with Doug Wahl. The evidence clearly and convincingly establishes Hoffman violated Canon 2A and Canon 4A of the Code of Judicial Conduct.

[¶ 16] In his brief, Hoffman addressed the September 30, 1997, protection order hearing before Judge Jorgensen, admitting he had characterized his November 22, 1997, divorce judgment and decree as "Judge Smith's 'fiasco' and 'Judge Smith's bullshit.'" Hoffman further said, "I did not say these things publicly. I said them privately in a publicly closed hearing under oath to tell the truth.... The Canons do not prohibit me for commenting on my divorce proceedings.... In this disciplinary action, I am being held responsible for Judge Smith's mistake." Hoffman continued: "I admit that I objected to a question at the protection order hearing. I made one objection.... Once I was informed of this judge's discretionary position[,] I obeyed it. I even called him 'your honor', so I can't see the disrespect or pattern of disrespect toward courts."

[¶ 17] The Honorable Donald Jorgensen testified that at a protection order hearing, Hoffman referred to "Judge Smith's fiasco" and "Judge Smith's bullshit," when referring to the decree entered in Hoffman's divorce. Judge Jorgensen also testified he told Hoffman he would hold him in contempt if he did not follow Judge Jorgensen's directions. Judge Jorgensen testified that, while Wanda Hoffman was testifying at that hearing, Hoffman "felt a need to interject himself and seek to place objections to her testimony, and I simply could not allow the proceeding to get out of hand and accordingly, that's why I interjected myself, but it was clearly without question in my judgment a challenge to the Court." The evidence clearly and convincingly establishes that Hoffman willfully violated Canon 2A of the Code of Judicial Conduct at the hearing before Judge Jorgensen.

[¶ 18] In his brief, Hoffman addressed the hearing panel's Finding V, about the appearance of Jill M. Quarstad, formerly Jill M. Christianson:

While people are entitled to a judge who will hear both sides and decide an issue on the merits, they are not entitled to a judge whose mind is a clean slate. Each judge brings to the bench the experiences of life, both personal and professional.... Mr. Fremgen agreed that the law was that a parent has an affirmative duty to facilitate a psychological relationship. Mr. Fremgen appears to agree that Ms.Christienson [sic] could be in contempt of court under the right circumstances. I have always held this belief about the affirmative duty. I made no personal attack on Ms. Christenson [sic] and no such thing has been alleged or found. I expressed my opinions of the law and facts in this case and nothing else. To find otherwise, would impinge on the essential independence of judges in making judicial decisions.

It has been alleged and found that I inserted my personal situation and arguments as a noncustodial parent into the proceedings and demonstrated a lack of dignity and courtesy to those appearing before me. My personal situations are my life's experience. However, I was both a custodial parent and a visiting parent so I don't know how the mere accusations of misconduct show miscon-

duct. This is a position on the law which has been with me for a long time. (Citations omitted.)

[¶ 19] Jill Quarstad testified that at a hearing before Hoffman on her complaint about her former husband's wife making 110 harassing telephone calls to her, Hoffman discussed Quarstad's affirmative duty to facilitate the psychological relationship between her child and her former husband. She testified about Hoffman's demeanor: "He was—the look on his face was almost sneering. He was very argumentative, he was very sarcastic. It was—it seemed like a cat-and-mouse game. He was the cat." We agree with the hearing panel's assessment that the evidence clearly and convincingly establishes Hoffman willfully violated Canon 2A and Canon 3B(4) of the Code of Judicial Conduct.

[¶ 20] In finding of fact VII, the hearing panel found that in a hearing on a class C felony charge against Peter Koble for violation of a protection order, regarding contacts with Lisa Koble, Hoffman "presented himself in the proceedings as reporting violation by Lisa Koble to law enforcement as well ... [and] Hoffman's conduct was colored by his own situation and arguments regarding his dual protection order." Hoffman argues in his brief, "This fact of a dual protection order in my personal life is not enough to show bias"; and "[m]y inquiry to Ms. Michelson was regarding gender discrimination in investigating and charging crimes in protection order cases.... I see nothing wrong with my reporting an alleged violation of the court's order."

[¶ 21] Lori Mickelson testified about the hearing before Hoffman on Peter Koble's violation of a protection order arising out of a divorce. Hoffman asked Mickelson, the state's attorney's representative at the hearing, if the victim, Lisa Koble, was

going to be charged with anything. When Mickelson replied her office had not received any reports about violations of the protection order by Lisa Koble, Hoffman said, "I'm reporting it then." The hearing panel found Hoffman's "conduct was colored by his own situation and arguments." Deferring to the hearing panel's opportunity to observe the demeanor of the witnesses, we conclude the evidence clearly and convincingly establishes Hoffman willfully violated Canons 2A, 3B(5), and 3E(1) of the Code of Judicial Conduct.

[¶ 22] We need not address additional findings of the hearing panel, because their resolution would not alter our decision on the appropriate sanction.

[¶ 23] The hearing panel has recommended Hoffman "be suspended for a period of six months and that he is to attend and participate in an anger management program." Hoffman has resigned his position as a district judge, so suspension from office is not an available sanction. Under R. Jud. Cond. Comm. 8, which was adopted effective August 1, 1997, a number of sanctions may be imposed for judicial misconduct:

### RULE 8. SANCTIONS IMPOSED; DEFERRED DISCIPLINE AGREEMENT

*Sanctions.* These sanctions may be imposed upon a respondent who has committed misconduct:

A. removal or retirement by the Supreme Court;

B. suspension by the Supreme Court;

C. imposition by the Supreme Court of limitations on the performance of judicial duties;

D. imposition of lawyer discipline by the Supreme Court;[5]

E. censure by the Supreme Court;

---

5. *See also* N.D.R. Lawyer Discipl. 1.1, which provides Hoffman, as a former judge who resigned from office and, thus, was not removed from office in the course of a judicial discipline proceeding, is subject to attorney discipline for conduct that occurred while he was a judge.

F. admonition by the commission with the consent of the judge, provided that an admonition may by used in subsequent proceedings as evidence of prior misconduct solely upon the issue of the sanction to be imposed, pursuant to Rule 10D(1); or

G. deferred discipline agreement.

Rule 8(D) provides for the imposition of lawyer discipline.

[¶ 24] Under N.D.R. Lawyer Discipl. 1.3A(2), (10), a lawyer's misconduct is grounds for suspension and limitation on the lawyer's future practice. As N.D. Stds. Imposing Lawyer Sanctions 2.2, recognizes, "a lawyer who has been suspended should not be permitted to return to practice until he has completed a reinstatement process demonstrating rehabilitation and fitness to practice law."

[¶ 25] Under N.D.R. Lawyer Discipl. 1.3(C),we consider aggravating or mitigating circumstances, which are specified in Standard 9.2 and Standard 9.3, N.D. Stds. Imposing Lawyer Sanctions. Under N.D. Stds. Imposing Lawyer Sanctions 9.4(d), "resignation prior to completion of disciplinary proceedings" is not "considered as either aggravating or mitigating." We conclude suspension from the practice of law for a period of six months is an appropriate sanction for Hoffman's willful violations of the North Dakota Code of Judicial Conduct while serving as a district judge. We further conclude Hoffman's reinstatement to practice should be conditioned upon his participation in and successful completion of an appropriate educational program to demonstrate fitness to practice law and an understanding of anger and violence management.

[¶ 26] Hoffman is ordered suspended from the practice of law for a period of six months and his reinstatement is conditioned upon participation in and successful completion of an appropriate educational program approved by the North Dakota Supreme Court to demonstrate an understanding of anger and violence management.

[¶ 27] VANDE WALLE, C.J., and MARING, NEUMANN, and KAPSNER,, JJ., concur.

SANDSTROM, Justice, concurring specially.

[¶ 28] I agree the conduct of Randall Hoffman merits suspension as ordered. The former judge believes he should be disciplined for uttering bad words at his former spouse. *See* ¶ 6. This minimizes his overall course of conduct. The majority's needless repetition of the obscene language uttered gives weight to the former judge's misperception, and diminishes the moral authority of this Court's opinion. *See Lovcik v. Ellingson,* 1997 ND 201, ¶ 18, 569 N.W.2d 697 (Sandstrom, J., concurring in the result).

[¶ 29] Just as the underlying evidentiary records in homicide cases necessarily include autopsy photographs, and the underlying evidentiary records in rape cases necessarily include the names of the victims, the underlying evidentiary record here necessarily includes obscenities. But just as this Court in its published opinions does not include autopsy photographs or the names of rape victims, we should similarly refrain from publishing the obscenities here. As we expect a higher level of conduct from judges, we should aspire to a higher level in our formal opinions.

[¶ 30] Dale V. Sandstrom.